IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

CHARLES PILGER,                          *

      Plaintiff,                    *

        v.                         *          CIVIL NO.: WDQ-10-0597

D.M. BOWMAN, INC.,                       *

      Defendant.                    *

          *

*   *   *   *   *   *   *   *   *   *   *   *   *

MEMORANDUM OPINION

Charles Pilger sued D.M. Bowman, Inc. ("Bowman") for violations of the Age Discrimination in Employment Act ("ADEA"),[1] the Family Medical Leave Act ("FMLA"),[2] and Maryland law. For the following reasons, Bowman's motion for summary judgment will be granted in part, and denied in part.

I.   Background[3]

Bowman is a trucking company headquartered in Williamsport, Maryland. Charles Pilger Dep. 29:6-8, July 29, 2010. *Id.* It has nine repair facilities, including one in Williamsport, and others in Frederick, Maryland, Somerset, Pennsylvania, and

---

[1]  29 U.S.C. § 621 *et seq.*

[2]  29 U.S.C. § 2601 *et seq.*

[3]  On summary judgment, Pilger's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

Huntersville, North Carolina. Vincent Boarman Dep. 13:10-12; 16:11-18:3, August 12, 2010. Although some maintenance of Bowman trucks is performed at the repair facilities, much of the maintenance is performed by outside vendors who are coordinated through Bowman's Williamsport maintenance division. Boarman Dep. 59:20-60:14; Pilger Dep. 58:16-59:6.

In 1980, Pilger began working as a shop manager in Bowman's maintenance division, and in June 1995, he became a maintenance team administrator. Def.'s Mot. Summ. J., Ex. A at ¶¶ 13 & 16. In 2006, Vincent Boarman became Bowman's director of maintenance. Boarman Dep. 5:21-6:18. Boarman selected Maxwell Dunn to become the maintenance team leader, and in February 2007, Boarman transferred Pilger to the position of breakdown coordinator, making Dunn his direct supervisor. *Id.* 8:16-22, 10-14-17; Maxwell Dunn Dep. 8:5-9:18, October 21, 2010; Def.'s Mot. Summ. J., Ex. A at ¶¶ 16-18.

As the breakdown coordinator, Pilger was responsible for communicating with drivers about maintenance issues on the road, and contacting vendors to make repairs. Boarman Dep. 10:20-11:2. Pilger had authority to approve repairs up to $1,000; more expensive repairs required Dunn's approval. *Id.* 11:2-6. Pilger was also responsible for reviewing and entering invoices for repairs he approved. *Id.* 11:19-13:2; 26:14-27:3.

2

On May 23, 2008, Dunn completed Pilger's annual performance review, which stated that Pilger was "[v]ery knowledgeable" about equipment and good at completing repairs, worked well with vendors and others, and tried to get his job done in a timely manner. Pl.'s Opp'n, Appx. 46-53. Dunn rated all categories of Pilger's performance as "meets expectations" or "exceeds expectations." *Id.* That same month, Pilger was temporarily assigned to perform manager duties at Bowman's Huntersville facility. Boarman Dep. 27:4-7. Following the Huntersville assignment, Dunn and Boarman noticed that Pilger had not entered all the facility's invoices on a timely basis. Dunn Dep. 56:7-14; Def.'s Mot. Summ. J., Ex. E. Pilger was about three months behind which, Dunn states, was worse than any other employee he supervised. Dunn Dep. 54:8-15.[4]

On June 18, 2008, Don Meckley, Bowman's director of operations, emailed Pilger, Dunn, and Boarman about "the 'process' for getting [Bowman] trucks serviced" in Augusta, Georgia. Pl.'s Opp'n, Ex. L. Pilger responded that trucks were "parked in a drop lot . . . a few miles from our vendor C&A Repair," and that C&A charged Bowman "$30 for [pick-up] and $30 for delivery. A safety inspection is done at that time & the

---

[4] Pilger states that many of the invoices Dunn says he failed to enter were received before he was assigned to Huntersville. Charles Pilger Aff. ¶¶ 52-53, Dec. 24, 2010.

trucks get an exterior wash." *Id.* Dunn's response to Pilger's
email was "Thanks"; Boarman did not respond. *Id.*

Later that summer, Pilger was assigned to temporary manager
duties at Bowman's Frederick facility. Def.'s Mot. Summ. J.,
Ex. F. He was to stay at Frederick until a new manager was
hired and trained. *Id.* Without permission, Pilger returned to
Williamsport on August 4, 2008. *Id.* On August 5, 2008, Dunn
emailed Pilger that:

> Neither [Boarman] nor I have given you permission to
> be back [in Williamsport] yet. I see that [Frederick]
> still has over 80 work orders on their side and [they
> are] going to need all the help that [they] can to get
> them closed for the end of the period. If I were you,
> I would hightail it back to Frederick and help . . .
> get them done and then come next week, we will see . .
> . about bringing you back to Williamsport. You seem to
> forget that you are not the one that makes that kind
> of decision without consulting [Boarman] or I.

Def.'s Mot. Summ. J., Ex G.

Later that day, Pilger and Boarman met in Pilger's
Williamsport office. Pilger told Boarman that he had returned
to Williamsport because of a doctor's appointment and because he
thought the new manager in Frederick was adequately trained.
Pilger Dep. 28:21-29:5; 29:16-21. When Boarman instructed him
to return to Frederick the next day, Pilger stated that he would
be unable to because he had requested August 6th through August
8th off to help his wife take her mother to the doctor. *Id.*

4

31:7-20.[5] Pilger's request for leave had never been approved, and Boarman told him he could not have those days off. *Id.* 31:21-32:3; 33:5-6. Pilger "reiterated to [Boarman] . . . that . . . being as late as it was, [he] could not find anyone to help [his] wife take her mother to the doctor's," but Boarman said if he did not show up in Frederick on August 6, he would be suspended. *Id.* 33:10-34:6. Pilger missed the next three days of work and was suspended for a week. Pl.'s Opp'n, Ex. H.

Boarman wrote a disciplinary action notice, which stated that he had "instructed [Pilger] to go back to his assigned work place" and "stay [there] until informed different[ly]." Def.'s Mot. Summ. J., Ex. F. Boarman said he told Pilger that "he had no vacation approved and needed to be where he was instructed to be," and that "just submitting vacation is not an automatic approval." *Id.* Boarman gave Pilger the notice when he returned from suspension on August 18, 2008.

On that day, Dunn gave Pilger a disciplinary action notice titled "final written warning." Def.'s Mot. Summ. J., Ex. E.[6]

---

[5]   Pilger's mother-in-law lived in Webster Springs, West Virginia, about five hours from Pilger and his wife. Patricia Pilger Dep. 7:12-14, Oct. 21, 2010. Mrs. Pilger has arthritis; the trip is difficult for her to make alone. *Id.* 17:2-7. She asked her husband to request leave from work so he could travel with her to West Virginia for her mother's eye doctor appointment. *Id.* 17:14-18:7.

In the notice, Dunn wrote that when he discovered Pilger's failure to input the Huntersville paperwork, he "told [Pilger] to get it in the system" three times, but Pilger "failed to follow instructions." *Id*. The notice stated that Pilger was expected to "have all paperwork entered in the system before the end of Period 9." *Id*. It also stated that he was expected to create a spreadsheet "detail[ing] how much time he spends on each break down and what else he does in a day's time." *Id*. When Dunn presented Pilger with the notice, he "refused to sign [it]" because he "felt there should have been changes." *Id*.[7]

On January 26, 2009, Dunn and Boarman asked to see Pilger in Dunn's office. Pilger Dep. 61:11-14. Pilger was given a termination notice written by Boarman, which stated that Pilger had received previous disciplinary notifications, and explained:

> I, as Director of Maintenance, was looking into [the] driving costs in the Augusta, Ga. operation and came across a thirty dollar routine inspection charge. I called [Pilger] and ask[ed] him what this was for. [Pilger said] that drivers were not doing their pre and post trip inspections, so he had the vendor start doing this . . . I asked him why he would do this when he was stopped from doing this at another location in the middle of 2008 . . . On 2/29/08 I called [Pilger]

---

[6] Dunn wrote the notice on August 5, 2008, but was unable to give it to Pilger until he returned from his suspension. Dunn Dep. 49:11-15.

[7] Pilger states that he did not refuse to complete the paperwork, but sent it back to the Huntersville facility because the new shop manager had requested it. Pilger Dep. 104:17-105:6.

> on my way back from our Augusta, Ga. operation to let
> him know that the washing of trucks would be moved
> from [38] to [49] dollars a unit, to help with the
> movement cost. I also told [him] at this time there
> was still no charge for movement of equipment for
> services and repairs, this was for washing only . . .
> When I was going through 2008 invoices I found we were
> paying for a pickup and delivery charge to and from
> our drop lot [in Augusta]. I asked [Pilger] when this
> took place and his reply was sometime around the
> middle of the year. Once again I asked why he didn't
> let me know. His response was he thought I already
> knew. If [Pilger] had been doing his job efficiently
> and correctly . . . he would have notice[d] that the
> vendor was picking up trucks to wash at the agreed new
> rate and charging a pickup and delivery fee on top of
> this. I found forty-eight invoices . . . charg[ing]
> us for washing, pickup, delivery and routine
> inspection. [Pilger] is well aware this is a mobile
> repair vendor and [he] should have been questioning
> why they were charging us for something that could
> have been done on the drop yard to help control our
> costs. These issues have cost the company over
> $12,000.00 . . . in 2008. This is totally
> unacceptable out of someone with over twenty eight
> years of experience with our company.

Def.'s Mot. Summ. J., Ex. H; Pilger Dep. 61:19-20. When he was

terminated, Pilger was 61, Boarman was 53, and Dunn was 43.

Pilger Aff. ¶3; Boarman Dep. 6:4-6.

On March 17, 2009, Boarman and Dunn hired 26 year old

Nathan Reid as the new breakdown coordinator. Thomas Gill Aff.

¶ 1. On March 4, 2010, after four warnings, and one "final

written warning," Reid was terminated for poor performance. *Id.*

¶¶ 2-7. On March 7, 2010, Boarman replaced Reid with 55 year old Glenn Smith. Def.'s Mot. Summ. J., Exs. M & N.[8]

On March 9, 2010, Pilger sued Bowman for age discrimination in violation of the ADEA and Maryland law, and retaliation in violation of the FMLA. ECF No. 1. Bowman moved for summary judgment on December 17, 2010. ECF No. 32.

II. Analysis

A. Standard of Review

Under Rule 56(a), summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in h[is] favor," *Dennis v. Columbia Colleton Med.*

---

[8] Between January 1, 2007 and November 20, 2009, Bowman had about 230 employees in its maintenance division. Gary Kelly Aff. ¶ 5. As of January 26, 2009, 44 percent of the maintenance division employees were over the age of 40, and 18 percent were over the age of 50. *Id.* ¶¶ 5-7.

*Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but it also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

   B.   ADEA Claim

   The ADEA makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age."  29 U.S.C. § 623.  To succeed on an ADEA claim, the plaintiff "must prove, by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employer decision." *Bodkin v. Town of Strasburg,* 386 Fed. Appx. 411, 413 (4th Cir. 2010) (*quoting Gross v. FBL Fin. Servs., Inc.,* 129 S. Ct. 2343, 2351 (2009)).

   There are two methods by which the plaintiff may prove his employer's discrimination: (1) "through direct or indirect evidence of intentional discrimination", or (2) "through circumstantial evidence under the [burden-shifting framework of] *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)." *Fairclough v. Bd. of Cnty. Commissioners,* 244 F. Supp. 2d 581, 587 (D. Md. 2003).

   Bowman argues that it is entitled to summary judgment on Pilger's ADEA claim because he has failed to show a *prima facie*

discrimination case under the *McDonnell Douglas* framework.
Def.'s Mot. Summ. J. 11. Pilger contends that he has direct
evidence of age discrimination, and does not need to proceed
under *McDonnell Douglas*. Pl.'s Opp'n 18.

1. Direct Proof of Discrimination

An employee may "us[e] any direct or indirect evidence
relevant to and sufficiently probative of [discrimination]" to
prove his case. *Brinkley v. Harbour Recreation Club,* 108 F.3d
598, 606-07 (4th Cir. 1999). To survive summary judgment,
Pilger must show "direct evidence of a stated purpose to
discriminate and/or [indirect] evidence of sufficient probative
force to reflect a genuine issue of material fact." *Id.*
(*quoting Goldberg v. B. Green & Co.,* 836 F.2d 845, 848 (4th Cir.
1988)) (alterations in original). The evidence must "clearly
indicate[] a discriminatory attitude at the workplace and must
illustrate a nexus between the negative attitude and the
employment action." *Hill v. Lockheed Martin Logistics Mgmt.,
Inc.,* 314 F.3d 657, 665 (4th Cir. 2003).

Pilger argues that the January 26, 2009 termination notice
is direct evidence of discrimination because it states that
acceptance of the 48 "washing, pickup, delivery, and . . .
routine inspection" invoices was "totally unacceptable [for]
someone with over twenty eight years of experience." Pl.'s

Opp'n 18-20. Pilger contends that the reference to his years of service is actually a reference to his age. *Id.*

"On average, an older employee has had more years in the work force than a younger employee, and thus may well have accumulated more years of service with a particular employer. Yet an employee's age is analytically distinct from his years of service." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 611 (1993). Thus, "it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Id.* The letter is neither direct proof of discrimination nor sufficiently probative indirect proof; alone, it would not bar summary judgment. *See id.*[9]

### 2. *McDonnell Douglas* Framework

"To prevail under the burden-shifting framework, [Pilger] must show: (1) he is 40 years of age or older; (2) he suffered an adverse employment action; (3) he was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open, or he was replaced by a

---

[9] *See also Weaver v. United States Filter Corp.,* 1997 WL 793588, at *3 (E.D. Pa. Dec. 3, 1997)(when viewed in context, employer's characterization of the plaintiff as an "old timer" was not direct proof of discrimination because "it [was] clear from [the] complete statement that the term was used . . . not about plaintiff's age but about her acquired knowledge and experience.").

substantially younger person." *Bodkin,* 386 Fed. Appx. at 413-14 (quotation marks omitted).

If Pilger shows a *prima facie* case, the burden of production shifts to Bowman to present a legitimate, non-discriminatory reason for the termination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000). Pilger must then "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (*quoting Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)).

### a. *Prima Facie* Case

Bowman argues that Pilger has not shown a *prima facie* case because he has not demonstrated that he was meeting its legitimate expectations when he was terminated. Def.'s Mot. Summ. J. 14. Pilger contends that his May 23, 2008 annual performance review satisfies the *prima facie* case, and there is a genuine dispute about whether Bowman actually expected him to enter all invoices, and avoid charges for "washing, pickup, delivery, and routine inspection" from C&A Repair. Pl.'s Opp'n 20-21.

A satisfactory performance review may be used to show that an employee was meeting expectations. *See Reed v. Airtran Airways,* 531 F. Supp. 2d 660, 667 (D. Md. 2008). But, Pilger

12

must also show that he was meeting expectations "at the time of the adverse employment action." *Bodkin,* 386 Fed. Appx. at 413-14. Here, eight months passed between the May 2008 performance review and Pilger's January 2009 termination. The May 2008 performance review is not sufficient to show a *prima facie* case.[10]

However, Pilger has also presented the June 18, 2008 email, in which he alerted Dunn and Boarman to the "washing, pickup, delivery and routine inspection" charges—which they did not object to at that time. Viewed in the light most favorable to Pilger, the email could support a conclusion that Pilger was not expected to avoid such charges. Thus, there is a genuine dispute about whether Pilger failed to meet Bowman's expectations by accepting the 48 invoices referenced by Boarman in the termination letter.[11]

---

[10] *See O'Connor v. Consol. Coin Caterers Corp.,* 56 F.3d 542, 547 (4th Cir. 1995)(employee's 1989 performance review was irrelevant to determination of whether his performance was satisfactory when he was terminated in August 1990), *rev'd on other grounds,* 517 U.S. 308 (1996).

[11] *See Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 517 (4th Cir. 2006)("Although on summary judgment an employer is free to assert that the job expectation prong has not been met, nothing prohibits the employee from countering this assertion with evidence that demonstrates (or at least creates a question of fact) that the proffered 'expectation is not, in fact, legitimate at all.").

13

Pilger has also presented evidence that between "January 1 and May 31, 2008"—i.e., the period during which Dunn rated his performance "meets expectations"—he entered an average of 293 invoices per month. Pl.'s Opp'n, Ex. J. Between May and August 2008—the period during which Dunn states Pilger was worse than any other employee at inputting invoices—he had entered an average of 337 invoices per month, which was more than any other employee. *Id.*[12] Pilger's evidence is sufficient to create a genuine dispute about whether he was meeting Bowman's expectations, which is enough to satisfy his initial burden.[13]

> b. Legitimate Non-Discriminatory
> Reason

After the employee presents a *prima facie* case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action, which, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio,*

---

[12] *See Huang v. Gutierrez,* 2010 WL 93274, at *8 (D. Md. Jan. 5, 2010)(despite employer's contention that plaintiff did not meet all expectations, plaintiff satisfied the third prong of the *prima facie* case with evidence that the employer did not require other employees to meet the same expectations).

[13] *See Gay v. Timberlake Homes, Inc.,* 2008 WL 3075588, at *6 (D. Md. Aug. 1, 2008)("establishing the *prima facie* case is not meant to be prohibitive or onerous" and "the performance expectations requirement should not be applied too strictly for fear of dismissing an otherwise meritorious claim").

*Inc.,* 53 F.3d 55, 58 (4th Cir. 1995). Because the burden is one of production and not persuasion, the court's analysis "can involve no credibility assessment." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509 (1993). Here, Bowman has met its burden of production by offering the termination notice stating that Pilger accepted invoices charging for tasks Bowman could have done on its own, which "cost the company over $12,000.00." Def.'s Mot., Ex. J.

### c. Pretext

Because Bowman has met its burden, "the presumption of unlawful discrimination created by the *prima facie* case 'drops out of the picture' and the burden shifts back to the [Pilger] to show that the given reason was just a pretext for discrimination." *Evans,* 80 F.3d at 959 (*quoting St. Mary's,* 509 U.S. at 511). "The plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against h[im]," *id.,* which may require "more than simply show[ing] the [employer's] articulated reason is false," *Laber v. Harvey,* 438 F.3d 404, 430-31 (4th Cir. 2006).[14]

As discussed above, a material question of facts exists about whether Pilger was expected to avoid incurring charges for

---

[14]   *See also Reeves,* 530 U.S. at 138 ("Certainly there will be instances whe[n], although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.").

washing, pickup, delivery, and routine inspections. A reasonable factfinder could conclude that this was not expected, and that the proffered legitimate reason for Pilger's termination is false. But, the ultimate question remains whether a reasonable factfinder could conclude that the termination was discriminatory. *Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000). "It is not enough to *dis*believe the employer; the fact-finder must *believe* the plaintiff's explanation of intentional discrimination." *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 327 (D. Md. 2003)(*quoting Reeves*, 530 U.S. at 147).

Pilger argues that a reasonable factfinder could conclude that his termination was discriminatory because Bowman's stated reasons are false, and Nathan Reid, his 26 year-old replacement was treated more leniently. Pl.'s Opp'n 16-24. "[T]he greater the age disparity between a replacement and a terminated employee, the stronger the inference of discrimination." *DeBord v. Washington Cnty. Sch. Bd.*, 340 F. Supp. 2d 710, 714 (W.D. Va. 2004). Here, 35 years separated Pilger and his replacement, which is a substantial difference. *See id.* And, as Pilger argues, more favorable treatment of younger employees may show discrimination. *See Ruff*, 226 Fed. Appx. at 303-04.

But, such evidence does not preclude summary judgment when the younger employee is not comparable to the plaintiff. *Id.* A

younger employee may not be comparable when he is subject to different performance standards or has significantly less experience than the plaintiff. *See Senske v. Sybase, Inc.,* 588 F.3d 501, 510 (7th Cir. 2009); *Forrest v. Transit Mgmt., Inc.,* 245 Fed. Appx. 255, 257 (4th Cir. 2007).

Pilger argues that Reid was treated more favorably because he was terminated after five warnings, whereas Pilger was terminated after "a single final written warning." Pl.'s Opp'n 2-4. However, Pilger does not dispute that Bowman's policy is "to fully document in writing all performance counseling and discipline of new employees" who, like Reid, are in "their initial probationary period." Boarman Aff. ¶ 8. Taken alone, Reid's treatment would be insufficient to show pretext. However, considered with the substantial age difference between the men, and Pilger's evidence that the proffered reason for his termination is false, a reasonable jury could conclude that his termination was discriminatory.

That Dunn and Boarman—like Pilger—were members of the ADEA's protected class may weaken an inference of discrimination; it does not require summary judgment. Dunn and Boarman were 18 and eight years younger than Pilger, respectively. They could be considered "substantially younger"

than Pilger,[15] and "a member of a protected class may discriminate against fellow members." *Saenger v. Montefiore Med. Ctr.,* 706 F. Supp. 2d 494, 510 n.9 (S.D.N.Y. 2010) (collecting cases). Bowman will not be granted summary judgment on Pilger's ADEA claim.[16]

   C.   FMLA Retaliation Claim

The FMLA makes it unlawful for an employer to interfere with, or retaliate against, an employee's exercise of rights protected under the Act. *Stroder v. UPS, Inc.,* 750 F. Supp. 2d 582, 588-94 (M.D.N.C. 2010). To state a *prima facie* case for retaliation under the FMLA, Pilger must show that: (1) he engaged in activity protected by the Act, (2) his employer took adverse action against him, and (3) the adverse action was causally connected to the protected activity. *Cline v. Wal-Mart Stores, Inc.,* 144 F.3d 294, 301 (4th Cir. 1998).

Bowman argues that it is entitled to summary judgment because Pilger's request to travel with his wife—who has arthritis—so that she could take her mother to the doctor is not protected activity under the FMLA. Bowman contends that because

---

[15]   *See Kess v. Mun. Emps. Credit Union,* 319 F. Supp. 2d 637, 648-49 (D. Md. 2004)(an individual who is eight years younger than the plaintiff may be "substantially younger").

[16]   "In the absence of legislative intent to the contrary," the Maryland Human Relations Act ("MHRA") is read "in harmony" with federal anti-discrimination statutes. *Chappell v. S. Md. Hosp., Inc.,* 320 Md. 483, 494 (1990). Accordingly, Bowman's motion will also be denied as to Pilger's MHRA claim.

the trip was not for Mrs. Pilger's medical care, and care for his mother-in-law is not protected under the FMLA, it is entitled to summary judgment. Def.'s Mot. Summ. J. 16-17. Pilger argues that the FMLA should be read "inclusive[ly]," and the trip is activity protected under 29 U.S.C. § 2612 (a)(1)(c). Pl.'s Opp'n 28.

The FMLA was enacted "to allow workers flexibility in scheduling time off to deal with family and medical problems and alleviate some of the tension created by the competing demands of work and family." *Scamihorn v. Gen. Truck Drivers,* 282 F.3d 1078, (9th Cir. 2002)(*citing* S. Rep. No. 103-3, at 4 (1993)). Section 2612 (a)(1)(c) grants eligible employees leave "to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." An employee may take this leave "intermittently or on a reduced leave schedule when medically necessary." 29 U.S.C. § 2612 (b)(1). Because the applicable regulations exclude care for parents-in-law,[17] Pilger's claim can survive summary judgment only if driving his wife to her mother's appointment was "care for" his wife. 29 U.S.C. §§ 2612 (a); *Sharpe v. MCI Telecomms. Corp.,* 19 F. Supp. 2d 483, 488 (E.D.N.C. 1998).

---

[17] 29 C.F.R. ¶ 825.122 ("Parent . . . does not include parents 'in law.'").

The applicable regulations state:

> [A]n employee is 'needed to care for' a family member
> . . . [when], for example, because of a serious health
> condition, the family member is unable to care for his
> or her own basic medical, hygienic, or nutritional
> needs or safety, or is unable to transport himself or
> herself to the doctor. The term also includes
> providing psychological comfort and reassurance which
> would be beneficial to a child, spouse or parent with
> a serious health condition who is receiving inpatient
> or home care.

29 C.F.R. § 825.124 (2009).

"As the language of the statute and regulation make clear,
the FMLA does not provide qualified leave to cover every family
emergency." *Fioto v. Manhattan Woods Enters., LLC,* 270 F. Supp.
2d 401, 403 (S.D.N.Y. 2003), *aff'd,* 123 Fed. Appx. 26 (2d Cir.
2005). Although the phrase "to care for" is broadly read to
cover physical and psychological care, "it cannot be read so
broadly that the concept of providing care is read out of the
statute." *Id.* at 406. To be within the FMLA's protection,
Pilger must present evidence that his leave was needed to care
for his wife's "basic medical, hygienic, or nutritional needs or
safety" because she was unable to care for those needs herself.
*See* 29 C.F.R. § 825.124.

Pilger has not shown that he took leave to provide
qualifying care to his wife. Pilger contends that he needed
leave because his wife's "arthritis prevented her from driving
long distances or helping her mother in and out of the car and

20

up and down steps," and he "feared that if he did not take the time off his wife might . . . have an auto accident or fall trying to help her mother." Pl.'s Opp'n 25. However, Pilger must have been providing on-going care for his wife to qualify for FMLA leave. *Fioto,* 270 F. Supp. 2d at 404. Pilger was not absent from work to care for his wife. He was absent from work to drive his wife to her mother's home—a trip unrelated to Mrs. Pilger's medical condition or basic needs. This care is not contemplated by the FMLA.[18] Bowman will be granted summary judgment on Pilger's FMLA claim.

III. Conclusion

For the reasons stated above, Bowman's motion for summary judgment will be granted in part, and denied in part.

_____
Date    6/2/11

_____
William D. Quarles, Jr.
United States District Judge

---

[18] *Cf. Tayag v. Lahey Clinic Hosp., Inc.,* 677 F. Supp. 2d 446, 452 (D. Mass. 2010)("It is far from clear that caring for a seriously ill spouse on a trip [made] for non-medical . . . purposes is a protected activity under the FMLA"); S. Rep. No. 103-3, at 24 (1993)("The phrase 'to care for' . . . is intended to assure employees the right to a period of leave to attend to a . . . spouse's . . . basic needs.").